**STATE of Minnesota, Appellant,**

v.

**Mitchell A. LEE, Respondent.**

**No. CX–85–655.**

Court of Appeals of Minnesota.

Oct. 29, 1985.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Beverly J. Wolfe, Asst. Co. Atty., Minneapolis, for appellant.

Phillip S. Resnick, Minneapolis, for respondent.

Heard, considered and decided by HUSPENI, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Respondent is charged with criminal sexual conduct in the third degree. *See* Minn. Stat. § 609.344(c) (1984). Pursuant to Minn.R.Crim.P. 28.04, subd. 1(1), the State appeals from a pretrial order granting respondent's motion to suppress statements made by him to one Henrietta Adams Faulconer. The trial court based its order on the grounds that the respondent had a reasonable belief that the communications he made to Faulconer were confidential and were therefore protected by the attorney-client privilege. The State contends that the suppressed statements are the only evidence corroborating the victim's statements asserting her lack of consent and that suppression of the evidence will have a critical impact on the outcome of the trial. We affirm and remand.

## FACTS

At the time of the alleged assault, both the victim and respondent were students at the University of Minnesota, and resided in the same dormitory. They had been introduced to each other earlier in the school year, but had only a few casual conversations together prior to the night of the alleged assault.

According to the criminal complaint filed against respondent, the victim left a study room on the dormitory's first floor about 11:30 p.m. on January 22, 1985, and headed towards the elevators to go to her room. As she was waiting for the elevator to arrive, respondent approached her and asked if he could come up to her room and talk. The victim told him that she was tired and asked him not to come up to her room. About 30 minutes later, after the victim had gone to her room, respondent knocked on her door and asked her to let

him in. She repeated that she was tired and he should come back some other time. A dormitory resident assistant noticed respondent talking to the victim through her door and asking her to let him in, and the resident assistant asked respondent if there was a problem. At that point the victim decided to open the door and allowed respondent to enter her room. The alleged assault took place shortly after respondent entered the victim's room, and he left soon afterwards.

After respondent left, the victim telephoned a friend who came over and stayed with her that night and into the next day. The criminal complaint states that the friend found the victim was hysterical and had difficulty explaining what had happened. Another friend who talked with the victim the next day reported that the victim was very upset and unable to talk about the incident. Both of these friends comforted the victim and encouraged her to call the police. Later that day the victim went to the Rape Counseling Center and the Hennepin County Medical Center for counseling and treatment, and the county sexual exam unit contacted the police. The sexual assault exam kit showed positive evidence of sperm. After the victim gave the police respondent's name and positively identified his photograph, respondent was charged with the offense. Respondent pleaded not guilty on February 19, 1985, at a hearing where probable cause was found.

Because respondent was a member of the University of Minnesota varsity basketball team, his arrest was publicized. One person who heard about the case was Henrietta Adams Faulconer. Faulconer is not an attorney, but has been involved for many years in criminal defense work by acting as a counselor/social worker for criminal defendants. She has had various paid and volunteer positions with organizations such as The Way, The Legal Aid Society, Legal Rights Center, and Operation De Novo. She has also been involved with the University of Minnesota's athletic department in assisting student athletes with any problems they might have.

Faulconer's involvement with the university's athletic programs prompted her to contact men's basketball coach James Dutcher. Faulconer testified at the suppression hearing that she called Dutcher to express her concern and offer her assistance. At Coach Dutcher's suggestion, she contacted respondent's attorney. She told the attorney she wanted to talk to respondent about the situation. She also told the attorney she would try to prevent respondent from being charged, and if necessary, she would talk to the prosecuting attorney. The attorney gave her permission to talk with respondent, and Faulconer then arranged with the court (which had placed respondent in the care of one of the athletic coaches) to visit with him.

Thus, two days after the incident occurred, respondent spent several hours talking with Faulconer. At the outset of their conversation, Faulconer explained to respondent that she wanted to help him, that his attorney had given her permission to talk with him, and that the information he gave her would be confidential. However, she also told him she would use the information he gave her to try to keep him from being charged with the offense. Respondent then related to Faulconer his version of the events of January 22. He did not significantly dispute the victim's version of the facts up until the point when he entered her room. As to what transpired after he entered the victim's room, respondent gave Faulconer information that corroborated some observations and conflicted with others that were set forth in the complaint.

In the few days immediately following the alleged assault, respondent also discussed the incident with a few other people besides Faulconer. He talked with some of his friends and with Coach Dutcher, as well as with his attorney.

Respondent's attorney later brought a motion to suppress the statements made by respondent to Faulconer on the grounds that they were privileged as an attorney-client communication. The trial court granted the motion, stating that because the respondent had a reasonable belief that the statements were confidential, the privilege would apply. The State appeals here from the court's order.

## ISSUE

Has the State clearly and unequivocably shown that the suppression of respondent's statements to Faulconer will have a critical impact on the outcome of the trial unless reversed?

## ANALYSIS

■ In a pretrial appeal from an order suppressing evidence in a criminal case, the court will reverse the trial court only "if the state demonstrates clearly and unequivocally that the trial court has erred in its judgment *and* that, unless reversed, the error will have a critical impact on the outcome of the trial." *State v. Webber,* 262 N.W.2d 157, 159 (Minn.1977) (emphasis added).

The rule in *Webber* was derived from Minn.Stat. § 632.12 (repealed 1979). That section governed the burden of proof imposed on the state when appealing a trial court's suppression order. The state was required to accompany its appeal with a statement:

asserting that the deprivation of the use of * * * a confession or admission ordered to be suppressed has rendered the proof available to the state with respect to the criminal charges filed by the court (1) insufficient as a matter of law, or (2) so weak in its entirety that any possibility of prosecuting such charge to a conviction has been effectively destroyed.

*Webber,* 262 N.W.2d at 159, (quoting Minn. Stat. § 632.12). The court in *Webber* went on to hold that, although the statute had been superceded by the Rules of Criminal Procedure, it continued to provide "a meaningful standard against which to measure the degree of harm to the state that will result from the suppression of evidence ordered after an Omnibus Hearing." *Id.*

There is no Minnesota Supreme Court case where the state has proved the "crit-

ical impact" strand of the *Webber* test. Our own court has only infrequently encountered situations where critical impact was shown. In some of these cases, the test was met because the suppression order effectively excluded all of the state's evidence in the case. Thus, the proof available to the state was insufficient as a matter of law. *State v. Whelan*, 350 N.W.2d 414, 416 (Minn.Ct.App.1984); *State v. Kline*, 351 N.W.2d 388, 390 (Minn.Ct.App. 1984).

In the case before us now, the state relies on *State v. Hanson*, 355 N.W.2d 328 (Minn.Ct.App.1984). The state argues that in this case, as in *Hanson*, the remaining available evidence may be sufficient as a matter of law, but is so weak in its entirety that any possibility of obtaining conviction has been destroyed by the suppression of the other corroborating evidence.

*Hanson* was also a sexual assault case, but there the victim was a nine year old girl. The trial court excluded illegally obtained evidence (sexually explicit magazines) which corroborated the victim's testimony that the defendant had read a "naked book." *Id.* at 329. This court reversed the suppression order, holding that because the only other evidence was the nine year old's testimony, the suppression of the corroborating evidence had a critical impact on the case within the meaning of *Webber*. Although the victim's testimony was sufficient as a matter of law, her young age affected her credibility, and the seized materials would assist the jury in evaluating that credibility. *Id.*

■ Unlike *Hanson*, the remaining evidence in the present case is not so weak that all possibility of conviction has been destroyed. Other evidence exists to corroborate the victim's statements. First, the state has the positive evidence of sperm from the police sexual assault exam kit. Second, there are other witnesses, including Coach Dutcher and some of respondent's friends, who can testify as to their conversations with respondent following the incident. Third, the dormitory resident assistant and another dormitory resident who saw respondent outside the victim's door that night can testify about what they saw and heard. Fourth, the friend that the victim called for help following the alleged assault and who was with her for several hours that night and the next day can testify as to the victim's emotional state and the events subsequent to the alleged assault.

This case is also distinct from *Hanson* due to the differences between the victims in the two cases. Unlike the nine year old victim in *Hanson*, the victim in this case is an adult, capable of testifying and of having her credibility judged without additional corroborating evidence.

In addition, a review of respondent's statements to Faulconer reveals that he gave her exculpating as well as incriminating information. This makes the evidence even less critical to the state's case. Also, probable cause was found by the trial court on February 19, 1985, over five weeks before Faulconer told county investigators about respondent's statements to her.

In view of the strict application of the *Webber* standard in precedent cases, and the availability of other evidence in this case, the state has failed to clearly and unequivocally show that the suppression of respondent's statements to Faulconer will have a critical impact on the outcome of the trial.

Because we find no critical impact, we need not reach the issue of whether the trial court erred in finding the attorney-client privilege protected the statements made by respondent to Faulconer. However, the trial court may itself later reconsider its suppression ruling upon proper application of the parties. *Webber*, 262 N.W.2d at 159; *State v. Schmieg*, 344 N.W.2d 425, 427 (Minn.Ct.App.1984); *State v. Pelovsky*, 347 N.W.2d 529, 531 (Minn.Ct. App.1984).

## DECISION

The order of the trial court suppressing respondent's statements to Faulconer is af-

firmed and the case is remanded for further trial court proceedings.